*Concerned Citizens of Cloverly v. Montgomery County Planning Board*, No. 620, September Term, 2021.  Opinion by Graeff, J.

**ADMINISTRATIVE LAW — JUDICIAL REVIEW OF AGENCY DECISION — PRESERVATION**

A reviewing court will not pass upon an issue presented to it for the first time on judicial review and that is not encompassed in the final decision of the administrative agency.  A passing reference to an issue, without making clear the substance of the claim, is insufficient to preserve an issue for appeal.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 620

September Term, 2021

_____

CONCERNED CITIZENS OF CLOVERLY,
ET AL.

v.

MONTGOMERY COUNTY PLANNING
BOARD, ET AL.

_____

Graeff,
Beachley,
Eyler, James R.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed: May 2, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

* Tang, J., and Albright, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

This appeal involves an ongoing land use dispute between the Concerned Citizens of Cloverly, appellants, and RCCG Jesus House, DC ("Jesus House"), intervenor. Jesus House seeks to build a church and a school on real property located in the Cloverly area of Montgomery County (the "Property"). In 2017, the Montgomery County Planning Board of the Maryland-National Capital Park and Planning Commission (the "Board"), appellee, adopted Resolution No. 17-019, approving Jesus House's preliminary plan to subdivide the Property. Appellants filed a petition for judicial review in the Circuit Court for Montgomery County, which affirmed Resolution No. 17-019. Appellants appealed, and this Court reversed the circuit court's judgment with instructions to remand to the Board for further proceedings. *See Concerned Citizens of Cloverly v. Montgomery Cnty. Plan. Bd.* (*Cloverly I*), No. 2568, Sept. Term, 2017 (filed March 14, 2019).

In 2020, after a hearing, the Board adopted Resolution 20-039, approving Jesus House's preliminary subdivision plan. Appellants filed a petition for judicial review in the Circuit Court for Montgomery County, which affirmed the Board's ruling.

On appeal, appellants present the following questions for this Court's review, which we have rephrased slightly, as follows:

1.    Did the Board err in accepting Jesus House's forest set-aside calculation relating to approval of the preliminary subdivision plan because the Maryland Department of the Environment ("MDE") did not review and approve the set-aside calculation?

2.    Did the Board err in accepting Jesus House's forest set-aside calculation because Chapter 27A.00.01.05.K of the Code of Montgomery County Regulations was not applied to the calculation?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

# FACTUAL AND PROCEDURAL BACKGROUND

## I.

## Events Prior to the Litigation Subject to Appeal

In August 2015, Jesus House filed Preliminary Plan No. 120160040 (the "Preliminary Plan") with the Board, seeking approval "to create one lot for a 1,600-seat religious assembly and associated 350-student private school on 15.55 acres of land." *Cloverly I*, slip op. at 2. "The school would operate during the week and the sanctuary would 'primarily be used for two services on Sundays and the multi-purpose center on weekends and on weekdays after peak hours.'" *Id.* at 3.

> The Property is in the RE-2 zone, Residential Estate – 2, meaning one house per two acres. Montgomery County Zoning Ordinance §§ 59-2.1.3(C)(1)(a)(i) and 59-4.4.4(B). "The intent of the RE-2 zone is to provide designated areas of the County for large-lot residential uses. The predominant use is residential in a detached house." § 59-4.4.4(A). The Cloverly Master Plan (the "Master Plan") in effect in 1999, and still in effect as of the date of this dispute, recommends that RE-2 zoned properties not be connected to public water or sewer services.

*Cloverly I*, slip op. at 3.

"In 1999, the former owners of the Property, Michael and Patricia Grodin, requested a water and sewer category change for the Property in anticipation of the sale of the Property to the Southern Asia Seventh Day Adventist Church," which planned to build a 750-seat church on the Property (the "Adventist Church"). *Id.* The owners' stated reason for the category change was "to protect the sensitive environmental feature of the forest stand in the headwaters of the Northwest Branch." *Id.* According to the owners, "[i]nstallation of an extensive underground septic field would require the destruction of

2

seven acres of mature forest stand[,]" which "can be prevented by allowing a connection to the abutting sewer line." *Id.*

In November 1999, the Montgomery County Council adopted Resolution 14-334. Resolution 14-334 "approved the water and sewer category change, approving the use of public water and sewer for the Property." *Id.* at 4. Such approval, however, "was 'restricted to private institutional facility use only,' with three conditions." *Id.* The condition relevant to *Cloverly I*, as in the present case, provides: "The church will establish a covenant preserving the forested area which would have been used for the on-site septic system."

The Adventist Church "was never constructed, and the Property subsequently was sold to Jesus House." *Id.* The Preliminary Plan "proceeded on the premise that [Jesus House] was entitled to the category change granting conditional approval of a sewer extension to the Property." *Id.*

Raztec Associates, Inc. ("Raztec"), a civil engineering firm retained by Jesus House, analyzed "the number of acres that were required to be set aside to meet the County Council's 1999 conditional approval of the sewer connection." *Id.* "In an unsigned memorandum dated November 9, 2016, Raztec concluded that a hypothetical septic system would require 4.82 acres, and '[t]herefore, 4.82 acres of existing forest area will be preserved to satisfy the existing sewer category change.'" *Id.*

Raztec's memorandum "noted that there were 1,600 proposed seats for the church," and "the school would have 350 students, K-12." *Id.* at 5. The memorandum also noted

the following "Regulations" and "Requirements" for calculating the hypothetical septic

system, i.e., the forest set-aside required under Resolution 14-334:

> 1. 10,000 square feet of septic area for each 500 gallons of water flow per day.

> 2. Church Use with warming Kitchen: 5 Gallons Per Day (GPD)/Seat

> 3. Septic trenches are laid out based on topography. Therefore the amount of space required for a septic system is also dependent on topography.

> 4. Each additional 10,000 square feet of absorption area or portion must be established on 15,000-40,000 square feet or proportional area depending on percolation rates.

*Id.*[1]

---

[1] Chapter 27A.00.01.08.A.2 of the Code of Montgomery County Regulations ("COMCOR") provides, in pertinent part:

> 2. In any subdivision the density of sewage disposal trenches for on-site disposal areas must meet the following criteria:

> a. All lots proposed for uses other than single family dwellings, for example, churches, . . . schools . . . , must have sufficient area for the initial absorption area and at least three recovery absorption areas. The total absorption area must be at least 10,000 square feet of useable area per 500 gallons of water flow per day or enough area for the initial and three recovery absorption areas, whichever is greater. . . .

> b. When the total required absorption area exceeds 10,000 square feet for lots proposed for subdivision approval, including areas proposed or established as easements, each additional 10,000 square feet of absorption area or portion, must be established on 15,000-40,000 square feet or proportional area depending on percolation rates. See 27A.00.01.05K for specific criteria.

Based on these regulatory requirements, and MDE's suggested number of wastewater gallons per day ("GPD") for a "Church-Assembly Hall" and "Schools & Colleges," Raztec set forth the following calculations in its memorandum:

> 1. Determine the required gallons per day based on a 1,600 seat church with a warming kitchen;
>
> 5 GPD/seat x 1,600 seats = 8,000 GPD
>
> Determine the area of septic required, based on 10.000 square feet of septic area for each 500 GPD of water flow.
>
> 8,000 GPD/500 = 16 x 10,000 = 160,000 Square Feet (3.67 Acres)
>
> 2. Determine the required gallons per day based on a 350 Students;
>
> 30 GPD/student x 350 students = 10,500 GPD
>
> Determine the area of septic required, based on 10.000 square feet of septic area for each 500 GPD of water flow.
>
> 10,500 GPD/500 = 21 x 10,000 = 210,000 Square Feet (4.82 Acres)

*Id* at 6.[2]   Raztec prepared the set-aside calculation based on the requirements of the Montgomery County Department of Permitting Services ("MCDPS") regarding "how to

---

[2] The Maryland Department of the Environment's *Guidance on Wastewater Flows for Use in Designing On-Site Systems* (Rev. June 2011), suggests that the number of wastewater gallons per day ("GPD") per unit for a "Church-Assembly Hall" and for "Schools & Colleges" would be:

| ESTABLISHMENT | GPD PER UNIT |
|---|---|
| **CHURCH-ASSEMBLY HALL** | |
| Per sanctuary seat | 3 |
| With private kitchen (members only) | 5 |
| With commercial kitchen (open to general public[)] | |

provide a septic system for a project." *Id.* at 7. The firm "had not designed the septic system for the project because such an exercise was unnecessary when no septic system was actually going to be built." *Id.*

In March 2017, the Board's staff ("Staff") recommended approval of the Preliminary Plan, with conditions. *Id.* Staff "noted that the sewer category change approved by the County Council in 1999 required Jesus House to preserve the area of forest that would have been removed for a septic system." *Id.* They determined, and the staff of the Montgomery County Department of Environmental Protection ("MCDEP") agreed, "that no specific acreage of forest preservation was required by the conditions of the sewer category other than that which would have been removed to accommodate a septic system and reserve area for a church on the property." *Id.* at 8. The report further noted:

> To confirm compliance with the County Council resolution, Staff and [MCDEP] required the applicant to submit wastewater calculations for the church and the private school proposed under this application to determine how much area would be required for a septic system to service the highest daily wastewater generator. The results of this analysis were confirmed by the [MCDPS]—Well and Septic section, determined that the private school is the highest wastewater generator (more so than the church) and would require a septic field of 4.82 acres if it were to be constructed. Thus, the preservation of 4.82 acres of existing forest satisfies the conditions of the sewer category change resolution. In addition, the requirements of the Forest

---

With Food Service License: see "Food and Beverage Service Facility"
Classroom space or meeting rooms intended for daily use, per seat          15

**SCHOOLS & COLLEGES (PER STUDENT)**
Without food or showers                                                                          15
Add for food                                                                                          5
Add for showers                                                                                      10
Boarding                                                                                              100
Day care, per student                                                                            15

6

Conservation Law have been applied to this application for the preservation of all the additional forest beyond the 4.82 acres. A Category I Forest Conservation easement will be the legal mechanism to preserve the forest required by the Forest Conservation Law and the sewer category change.

The application substantially meets the recommendations of the 1997 Cloverly Master Plan.

*Id.* Staff recommended approval of the Preliminary Plan, with conditions. *Id.* at 9.

The Board subsequently held a public hearing on the Preliminary Plan. At the hearing, the Board "confirmed that Jesus House would be hooking up to public water and sewer," and it "heard testimony from several members of the community." *Id.* Casey Anderson, Chair of the Board, stated that his understanding was that "the jugular vein of this [hearing] is whether or not the interpretation by [MCDEP] of the conditions of the access to the public water and sewer system are appropriate," and he questioned whether the Board was required to defer to MCDEP. *Id.* at 12.

Jason Fleming, an employee of the Well and Septic Section of MCDPS, testified "regarding the accuracy of the septic area calculations." *Id.* at 14. He testified that, under the Code of Maryland Regulations ("COMAR"), MDE promulgated "guidance to calculate wastewater flows," and "[i]t 'made a list of the amount of gallons per day [to] apply to particular situations in commercial applications.'" *Id.*

Mr. Fleming explained that they used those numbers, and he did not disagree with Raztec's calculations. He agreed that other calculations might be appropriate based on percolation tests and other soil analysis, but he stated that it was their understanding that it was not necessary actually to test the soil "to meet the idea of the County Resolution." With respect to one of the citizen's argument that the calculation of 10,000 square feet per 500 gallons was not appropriate, Mr. Fleming explained that, "once you get a septic system that requires more than 10,000 square feet in area, that then you have

7

to make sure that your property or the land that the septic system is going to be located in is enough to start diluting the nitrate" levels to get them below the specified EPA levels, but the actual size of the septic area had "to be 10,000 square feet per 500 gallons."

*Id.*

In May 2017, the Board adopted Resolution 17-019, approving the Preliminary Plan, with conditions. *Id.* at 16–17. The Board stated that, "given the respective roles of MCDPS, MCDEP, and the Board," it was "not convinced" that it had the authority "to make its own determination about the proposed development's compliance with the County Council's conditional approval of the sewer extension and to look behind MCDPS and MCDEP analyses that led [MCDEP] to conclude that it does." *Id.* at 17.

The circuit court affirmed the Board's decision approving the Preliminary Plan. *Id.* at 19–20. This Court reversed, with instructions to the circuit court to remand to the Board for further proceedings. *Id.* at 2. We observed that the Board "is tasked with the ultimate responsibility to determine whether the preliminary plan meets the requisite conditions and should be approved." *Id.* at 23. We noted that "the Board did not rely on the analysis by [MCDPS] after making an independent assessment of this analysis. Rather, it concluded that it could not 'second guess' [MCDPS'] analysis." *Id.* Accordingly, we concluded that the Board erred in approving the Preliminary Plan because it "determined that it lacked the power to independently assess the validity of the septic set-aside calculations to ensure that the Preliminary Plan conformed with the conditions required by Resolution 14-334." *Id.* at 24. We therefore reversed and instructed the circuit court to remand to the Board for further proceedings. *Id.*

8

**Staff's Recommendation on Remand**

On April 30, 2020, after reviewing new information submitted by Jesus House and appellants, Staff again recommended that the Board approve the Preliminary Plan, with conditions. Pursuant to the remand order, Staff focused on "the adequacy of the septic calculations and conformance with County Council Resolution 14-334." The report discussed the forest set-aside requirement set forth in Resolution 14-334, as follows:

> The condition from the County Council Resolution with the greatest impact on the Application is the requirement to establish a covenant preserving the forested area which would have been used for an onsite septic system. The language approved by the County Council in Resolution 14-334 is the guidance that Staff must interpret and implement. However, County Code and the County Council Resolution does not provide guidance on the methodology to calculate the size needed for a septic system when the system will not actually be installed. When developing a property to be served by an on-site septic system, a site evaluation is required to determine a satisfactory area for the septic field and replacements. The design flow, depth to a limiting condition, and the infiltration rate of the soil determines the area of the septic system. To perform a site evaluation, equipment must be able to access the property resulting in tree loss and other environmental impacts. Normally, these environmental impacts tend to be of little importance because the construction of the septic system will remove all the large trees. The circumstances of this Application are much different.

> The methodology used to determine compliance with County Council Resolution 14-334 is a pivotal issue with this Application. Specifically, the decision to use a mathematical calculation which is utilized to provide a professional estimate using requirements in the County septic code. In this Application, the forest identified outside the limits of disturbance shown on the Final Forest Conservation Plan will be retained and a septic system will not be installed. If a site evaluation was completed, it would have consequences. Staff estimates that an acre or more of forest could be removed in order to perform a site evaluation.

While doing a site-specific design would provide another solution, the amount of time, effort, and impact on the Property does not appear to have been considered by the County Council in 1999. It also opens up numerous questions neither the County Code nor the County Council Resolution can answer and doesn't provide direction to Staff. The County Council Resolution cites no methodology to determine compliance and the County Code is not designed to provide a regulatory structure for septic systems that won't actually be constructed or account for the environmental impacts of site evaluations done to only achieve data without resulting in future construction of a septic system. The County Code is designed to review septic systems for construction rather than compliance with the arbitrary standard established by County Council Resolution 14-334.

To "determine the size (i.e. acreage) of a septic system to serve" the Property, and therefore, "to achieve compliance with the County Council's conditions as they were written," Staff "and MCDEP in conjunction with the [MCDPS], Well and Septic Section requested wastewater calculations on a gallons per day basis for the 1,600 seat church and the 350 student private school." The report noted that

[b]etween the two different uses, the higher level of gallons per day of wastewater generation, in the case of the private school, has been implemented to determine the mathematical septic system size and by extension the amount of forest to be preserved as a requirement of the condition from the County Council.

Based on that information, MCDEP and MCDPS confirmed the accuracy of Raztec's set-aside calculation and its compliance with Resolution 14-334. Staff accepted Raztec's set-aside calculation and, based on "the accepted practices available for projects with variable daily flows (flow equalization) and shallow or low permeable soils (mound systems)," determined that "the calculations produce a reasonable forest save area."

With respect to appellants' contentions that (1) "the church and the private school are not separate uses, but rather concurrent uses," which required a septic calculation

10

combining both uses, and (2) Jesus House ultimately would have a commercial kitchen in the church, which would significantly change the wastewater generation from the church, the size of the septic system, and "the forest save area required by the County Council resolution," Staff stated that it was "unable to speculate how any property owner will or won't use property in the future." It could only review the information provided within the Application. "After the Application is constructed, it becomes an enforcement action by the relevant agency with jurisdiction."

## III.

### Public Hearing Before the Board on Remand

On April 30, 2020, the Board held another public hearing regarding the Preliminary Plan. Matthew Mills, counsel to the Board, stated at the outset of the hearing:

> Based upon the remand order from the circuit court, called before the Board today is the obligation to make an independent assessment of the validity of the septic set aside [numbers] proffered by the applicant in order to ensure that the Preliminary Plan conforms with the conditions required by Montgomery County Council Resolution 14-334, which requires in exchange for a sewer category change, that the amount of forest which would have been cleared for a septic system be preserved with the covenant. The hearing is limited to this one issue.

Mr. Mills reiterated that the question before the Board was whether Jesus House's "numbers for the septic set aside are accurate."

Counsel for appellants noted three concerns with the 4.2 acre set-aside proposed by Jesus House: (1) "error in the application of code standards for septic field calculations"; (2) "concurrent use of the church and school buildings"; and (3) "the inevitability of a commercial grade kitchen in the church." He stated that appellants' expert, Elik Livay, a

11

professional engineer, would explain that an appropriate calculation for the set-aside would be: (1) 7.21 acres, assuming the veracity of Jesus House's claim of weekday-only school use and weekend-only church use; (2) 12.63 acres, assuming concurrent school and church use, but no commercial kitchen in the church; or (3) 18.14 acres, assuming concurrent use and a commercial kitchen in the church. Counsel stated that "[a]ll of these numbers must be considered in light of the presence of only 10.02 acres of forest available for set aside on the property," concluding that Jesus House's "project is too big" for the Property.

Mr. Livay testified that his firm, Gannett Fleming, Inc. ("Gannett Fleming"), "performed a detailed evaluation" of the Preliminary Plan, which included a review of the April 17, 2020 report prepared by Staff. Although Staff and Jesus House's engineer, Raztec, determined that 4.82 acres were "required to be cleared to accommodate construction of an onsite septic system," Gannett Fleming determined that a "much larger area, as large as 18.14 acres, [was] required." Mr. Livay identified the "three main reasons for the discrepancy between the two different numbers," as follows:

> First, County staff and applicant's engineer did not follow County code when they calculated the total required absorption area. Second, the County used just the school in the flow count collections, while we used concurrent flows from both the school and the church. And third, the County used a non-commercial kitchen, while we used commercial kitchen.

During his testimony, Mr. Livay testified regarding "three discrepancies" in the forest set-aside calculation, as follows:

> By code of Montgomery County regulations [27A.00.01.08], paragraphs [A.2.a] and [A.2.b], in order to determine the required absorption area, a calculation must be completed based on 10,000 square feet per 500 gallons per day times the required modification factor, which is between 1.5

12

and 4 based on the results of the percolation test. For each additional 500 gallons per day of flow, as well as a calculation based on layout for an initial absorption area and recovery absorption area. Both calculations should have been completed to determine which area is larger. The County staff know the applicant's engineer performed both calculations.

We did perform both calculations based on the scenarios and per the above, and per the cite of the County court, the first 500 gallons per day requires a 10,000 square feet absorption area. For water flow above 500 gallons per day, for each additional 500 gallons per day unit of water flow, there must be an absorption area of somewhere between 15,000 to 40,000 square feet, depending on the percolation rate. Mathematically, this means a multiplication factor of 1.5 to 4 times, at least 10,000 square feet for each additional 500 gallons per day of projected water flow.

He testified that there are two calculations to be done. First, there is a calculation regarding 10,000 square feet of septic area for the first 500 GPD of wastewater. Then, where the wastewater flow exceeds 500 GPD, a second calculation is needed using a "multiplication factor" of 1.5 to 4 times for each additional 10,000 square feet of septic area because a larger area of land per gallon is needed to account for soil conditions and percolation rates. Mr. Livay stated that Raztec and Staff "just multiplied by 10,000 square feet" and did not apply a multiplication factor and "account for additional 15,000 and potentially up to 40,000 square feet in the second round of calculations." He was conservative in his calculations, using the minimum multiplication factor of 1.5 for each additional 500 GPD. Using that calculation, and considering the land required for the combined use of the church and school and the church's use of a commercial kitchen, the calculation resulted in a set-aside area of 18.14 acres.

Mr. Livay also testified that, although Staff stated that the uses for the Property are not simultaneous and only the school's daily use should be used in the set-aside calculation,

13

his opinion was that the hypothetical septic system for the Property "should be sized to accommodate a potential maximum wastewater flow for all uses on the site." Because "the church can have services or activities on days that the school is in session," the "system needs to be sized to account for potential maximum use which is both the school and the church."

Finally, Mr. Livay opined that "a commercial kitchen should have been used to determine the church flow rate." He noted that there was "no zoning impediment to including a commercial kitchen as an accessory used for the church."

In concluding his testimony, Mr. Livay stated:

> [I]t is my professional opinion that the wastewater flow from the two facilities on the property in question should be combined as both could be used in any single day, which would be the maximum daily intake flow. Further, based on hypothetical system and the information available, our analysis of the proposed system indicated that the minimal of 12.63 acres, assuming warming kitchen, or 18.14 acres, assuming commercial kitchen, should be preserved as equivalent forested area to comply with the covenant set forth in [R]esolution 14-334.
>
> \* \* \*
>
> I do not see the standard that [was] established by County Council Resolution 14-344 is in any way arbitrary. In my professional opinion, County staff should have treated this issue as if an onsite septic system . . . had to be constructed and not just conduct a mathematical exercise.
>
> As explained previously, however, the use of conservative multiplier of 1.5 means that the actual site-specific design could only yield a higher acreage number, not a lower one. So, a missing ingredient does not impact any conclusion that the set aside requirement of at least 12.63 acres is more than this applicant can meet with this project on the site, which is the only, which adds only 10.02 acres of forest.

14

The Board Chair stated that "the jugular vein here is Mr. Livay's testimony about what the appropriate way to calculate the size of a septic field for a proposed structure is." Heidi Benham, the manager of MCDPS's Well and Septic Section, testified with respect to Mr. Livay's septic calculations. She discussed his increase in "the acreage of the septic area by adding a multiplication factor for the land required," and stated that she was not sure where the multiplication factor came from, noting that it was not referenced in the Code of Montgomery County Regulations ("COMCOR"). The table in "the code," i.e., COMCOR 27A.00.01.05.K, listed 15,000 to 40,000 square feet "for determining the overall size of the lot itself, not the amount of septic area."

Ms. Benham testified regarding the intent of COMCOR 27A.00.01.05.K, as follows:

> The intent behind this regulation was to ensure that nitrate levels stayed below the allowable amount for lots that were created with septic areas over 10,000 square feet. So, as the effluent moved underground and across the property, the nitrate would dilute to at or below the limits set before the nitrogen plume left the property boundary.

She explained that the density requirement set forth in COMCOR 27A.00.01.05.K was outdated and not needed because nitrate levels could be reduced with pretreatment and technology. Due to the technology now available, MCDPS did not "really have to use this part of the regulation." She agreed that the code did not require a multiplier, and there was just "supposed to be a linear relationship between the amount of effluent and the square footage of the septic field." That proportion did "not vary with amount of effluent or size."

15

The Board Chair clarified that Ms. Benham's testimony was that the additional square footage requirement related to the size of a lot, not the size of a septic field, and there was no requirement for any multiplier in the code. And independent of the code, it was not important to increase the size of a lot because "the original intent behind that regulation was to reduce the amount of nitrogen" emanating from a septic field, but "things have evolved to where now we have technology that can do that."

Ms. Benham additionally explained that "designing a system based on cumulative flows is not really a common practice because it usually results in a design flow that's excessive and not indicative of actual flow data." The school was the highest generator of wastewater, and that was the basis of their calculations.

Counsel for Jesus House stated that there were three issues before the Board: "One is the type of kitchen that's going to be used; the second is the concurrent versus the joint use; and the third one is the calculation." Counsel stated that Jesus House had no "intention to have a commercial kitchen in their new facility." She asserted that Jesus House would agree to a condition or use covenants "to try to prevent that from happening." Regarding the second issue, Ms. Benham "just answered the major questions that have come up regarding" the calculation based on "concurrent use." Finally, with respect to the "multiplier factor," counsel noted that MCDPS had already advised appellants that COMCOR 27A.00.01.05.K was "not applicable in cases where advanced pretreatment of the sewage is required. If an application was received for [a] place of worship of this site,

16

pretreatment would be required." Appellants' expert, however, continued to state that a multiplier was required, even though MCDPS said that it did not apply.

At the close of the hearing, the Board unanimously voted to approve Staff's recommendation to approve the Preliminary Plan, with conditions.

## IV.

## Resolution No. 20-039

On August 14, 2020, the Board issued Resolution No. 20-039, approving the Preliminary Plan to create one lot on the Property, subject to the condition that approval was "limited to one (1) lot for a religious assembly up to 1,600 seats with a non-commercial kitchen facility and an associated private school for up to 350 students with no child daycare facility." The Board found that "the Preliminary Plan meets the conditions of the sewer category change set forth by Montgomery County Council Resolution 14-334." That resolution did not provide any specifics regarding how to determine compliance with the condition that "the church will establish a covenant preserving the forested area which would have been used for the on-site septic system."

The Board found that "the County Council, in granting the sewer category change in Resolution 14-334, did not intend for percolation testing or any other form of testing to be performed" on the Property resulting "in the removal of forest or trees." Accordingly, the Board found that a mathematical approach to determining compliance with the resolution was appropriate.

It stated that appellants had "misinterpreted the requirements of [COMCOR 27A.00.01.05.K] by concluding, and adding into their calculations, that the septic set aside must be increased for density requirements." Although "the requirements of [COMCOR 27A.00.01.05.K] require the septic area to be established on an additional 15,000 to 40,000 square feet of land when the septic area exceeds 10,000 square feet," that did not mean that the additional area must be added to the septic area. It explained:

> This regulation is used to ensure that nitrogen levels stay below the allowable amount by determining the necessary size of the overall lot, not the size of a septic area. Thus, the misinterpretation by the [appellants] and their representatives has resulted in an additional multiplication factor added to their septic set aside calculation that does not exist in [the] Montgomery County Code.

The Board further found that that COMCOR 27A.00.01.05.K "only applies in a scenario where subdivision is occurring which increases density." It stated:

> The term "Subdivision" is defined in COMCOR 27A.00.01.01 as "the division of a single tract, tracts, or other parcels of land, or a part of it, into two or more lots, for the purpose, whether immediate or future, of sale or building development." This Application seeks to aggregate three unplatted tracts of land into one platted lot. Therefore, the Planning Board finds that [COMCOR 27A.00.01.05.K] does not apply to this Application because it does not meet the threshold defined within COMCOR Chapter 27A as a "Subdivision." The Planning Board finds that, in the context of the COMCOR, this Application creates a "lot" defined as "a part of a subdivision or a parcel of land used as a building site or intended to be used as a building site, whether immediate or future, which would not be further subdivided" in COMCOR 27A.00.01.01.

Accordingly, the Board found that Jesus House's forest set-aside calculation was "accurate showing the private school to generate the maximum daily flow rate" and that it met "all

18

applicable requirements of COMCOR Chapter 27A as well as the requirements and intent of County Council Resolution 14-334."

With respect to the argument that a concurrent use analysis was required, the Board stated:

> The weekly, biweekly, and annual events for the church and private school, when taken in totality, do not add significant wastewater flows necessitating an increase in the maximum daily flow (MDF) to justify a septic set aside calculation for a septic system design based on a concurrent use. Whether or not the uses associated with the church and private school are occurring at the same time is irrelevant based on the expected frequency, duration and attendance of events. The relevant issue in the context of the septic calculations is that the design flow of the septic system remains unchanged. Additionally, [COMAR] 26.04.02.05(J) states that the Approving Authority may approve design flows based upon actual flow measurements. Based on the benchmark measurement of daily average consumption provided by the Washington Suburban Sanitary Commission (WSSC) over a 12-month period for the existing RCCG Jesus House facility in Silver Spring, Maryland, the water usage is significantly less than the figures used in the State of Maryland flow guidelines, which further supports the septic set aside calculations provided by the Applicant.

With respect to the kitchen, the Board found that "the language of the covenant, required by County Council Resolution 14-334, must include a prohibition on the permitting and construction of a commercial kitchen associated with the church or private school in perpetuity," and "as conditioned," Resolution No. 20-039 was "adequate to prevent the future construction of a commercial kitchen resulting in an MDF over and above the septic calculations endorsed by the Planning Board."

19

## V.

## Subsequent Appeal to the Circuit Court

On September 9, 2020, appellants filed a petition for judicial review in the Circuit Court for Montgomery County. After a hearing, the circuit court issued its opinion and order, finding that the Board's "decision, memorialized in Resolution No. 20-039, was both legally correct and supported by substantial evidence." The court found that the Board "was well within its discretion to make its decision based on a calculation of school use alone," which "was confirmed by multiple agencies" and "supported by substantial evidence." It stated that "[t]here is simply no legal mandate for a cumulative use calculation."

The circuit court also disagreed with appellants' contention that the set-aside calculation should have incorporated a "1.5 multiplier" pursuant to COMCOR 27A.00.01.05.K. The court found that Resolution 14-334, unlike COMCOR 27A.00.01.05.K, did not reference an "absorption field," and the distinction between a "septic area," as referenced in Resolution 14-334, and an "absorption field" was "one of fair debate." In resolving this distinction, the Board "could have found the two terms to be the same and required the additional space to be factored into the septic set-aside calculation—but—it declined to do so." Thus, the court found no legal error in the Board's interpretation of COMCOR 27A.00.01.05.K.

This appeal followed.

**STANDARD OF REVIEW**

"The standard for appellate review of an administrative agency decision differs depending on whether agency factfinding or law determinations are under attack." *Cross v. Balt. City Police Dep't*, 213 Md. App. 294, 306 (2013).

> For fact findings, a reviewing court applies the "substantial evidence" standard, under which the court defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences. [*Maryland Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 120 (2016)]. In particular, with respect to factual issues that involve scientific matters within an agency's area of technical expertise, the agency is entitled to "great deference." *Id.*

> \*     \*     \*

> With respect to an agency's legal conclusions, a reviewing court accords the agency less deference than with respect to fact findings or discretionary decisions. *Anacostia Riverkeeper*, 447 Md. at 122. In particular, a court will not uphold an agency action that is based on an erroneous legal conclusion. *Id.* However, in construing a law that the agency has been charged to administer, the reviewing court is to give careful consideration to the agency's interpretation.

*Md. Dep't of Env't v. Cnty. Comm'rs of Carroll Cnty.*, 465 Md. 169, 201–03 (2019), *cert. denied*, 140 S. Ct. 1265 (2020).

"In an appeal from judicial review of an agency action, we look through the decision of the circuit court and review the agency's decision directly." *W. Montgomery Cnty. Citizens Ass'n v. Montgomery Cnty. Plan. Bd. of Md.-Nat'l Cap. Park & Plan. Comm'n*, 248 Md. App. 314, 332–33 (2020), *cert. denied*, 474 Md. 198 (2021). We do not consider the circuit court's findings of fact and conclusions of law. *Mid-Atl. Power Supply Ass'n v.*

*Md. Pub. Serv. Comm'n*, 143 Md. App. 419, 432 (2002). *Accord Md. Off. of People's Couns. v. Md. Pub. Serv. Comm'n*, 226 Md. App. 483, 500 (2016).[3]

## DISCUSSION

## I.

### MDE Review and Approval of the Forest Set-Aside Calculation

Appellants contend that, when calculating wastewater use where the flow exceeds 5,000 GPD,[4] the design for a septic system requires calculating the MDF, which takes into account all uses on the site that generate wastewater, "unless a lesser flow number is approved by" MDE. They assert that the Board's determination, approving a set-aside calculation based only on the school, the highest daily use, as opposed to the MDF, where the anticipated GPD of wastewater flow exceeded 5,000, was erroneous in the absence of MDE review and approval.

Jesus House and the Board contend that "nothing in the law required MDE's review and approval of the septic area calculation in this case." They argue, among other things, that MDE's review and approval for wastewater flows in excess of 5,000 GPD "applies only where a permit application will be filed for a septic system that will actually be

---

[3] To the extent that appellants argue that the circuit court erred in its judgment, we will not consider those arguments. Instead, we will focus on the arguments relating to the proprietary of the Board's decision.

[4] As indicated, "GPD" refers to "gallons per day."

constructed."[5]  Because there will be no permit application, and no septic system actually will be constructed, MDE review and approval of the set-aside calculation was not required.

We will not address this issue because it was not presented to the Board.  "The Court of Appeals has repeatedly emphasized that a reviewing court 'may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency.'" *Mesbahi v. Md. State Bd. of Physicians*, 201 Md. App. 315, 333 (2011) (quoting *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123 (2001)).  The "primary purpose" of this rule "is to give the administrative agency the opportunity to decide the issue" because, "when an appellate court is the first to decide an issue, it deprives the agency of that opportunity." *Colao v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 167 Md. App. 194, 202 (2005). *Accord Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 530 (2003) ("[J]udicial review of the actions of an administrative agency is restricted primarily because of the fundamental doctrine of separation of powers as set forth in Article 8 of the Declaration of Rights of the Maryland Constitution.").

---

[5] Appellees note that, although COMCOR 27A.00.01.07.G provides that "[a]ll systems treating 5,000 gallon daily flows or more require review and approval by the Maryland Department of the Environment and must be included in The Comprehensive Water and Sewerage Systems Plan," this requirement "applies only where a permit application will be filed for a septic system that will actually be constructed."  They point to the words "all systems" as showing that what the MDE must approve is an actual septic system.  Moreover, the regulation requires that the system be included in the water and sewer plan, which they argue leads to the conclusion that the requirement for MDE approval applies only to a septic system that will actually be constructed.

Here, appellants did not argue before the Board that it should not approve the Preliminary Plan because there had not been MDE review and approval of the forest set-aside calculation. At the public hearing in 2020, after our initial remand, appellants' counsel argued that the project was too big for the Property, and the set-aside calculation by Raztec, Jesus House's expert, was incorrect for three reasons: (1) it was based on an incorrect "application of code standards for septic field calculations"; (2) there would be "concurrent use of the church and schools buildings"; and (3) it did not account for the "inevitability of a commercial grade kitchen in the church." Mr. Livay, appellants' expert witness, testified to three alleged discrepancies in the forest set-aside calculation, as follows:

> First, County staff and applicant's engineer did not follow County code when they calculated the total required absorption area. Second, the County used just the school in the flow count collections, while we used concurrent flows from both the school and the church. And third, the County used a non-commercial kitchen, while we used [a] commercial kitchen.

Appellants did not argue, as they do here, that the Preliminary Plan could not be approved without MDE review and approval of the set-aside calculation.

Appellants acknowledge the rule that "a reviewing court 'may not pass upon issues presented to it for the first time on judicial review and that are not encompassed in the final decision of the administrative agency.'" *Mesbahi*, 201 Md. App. at 333 (quoting *Campbell*, 364 Md. at 123). *Accord Brzowski v. Md. Home Imp. Comm'n*, 114 Md. App. 615, 636–38 (Because homeowner did not raise during the administrative proceedings "the specific contention that the statutory time for review of the award by the arbitrator" had expired, he

24

failed to preserve the issue for judicial review.), *cert. denied*, 346 Md. 238 (1997). They argue, however, that they did raise the issue. We disagree.

At oral argument, counsel for appellants stated that the issue was raised before the Board. In support, counsel did not cite to any testimony or argument at the hearing, but rather, he cited to Mr. Livay's written testimony, which was entered into the administrative record. Counsel pointed to a sentence in Mr. Livay's testimony that stated that "[t]he size of this hypothetical onsite treatment system *would have required* approval through MDE." (Emphasis added). The written statement, however, did not say, as appellants argue on appeal, that the Preliminary Plan should not be approved because MDE had not approved the set-aside calculation. The minor reference in the report to MDE, which was not discussed by either Mr. Livay or counsel at the hearing before the Board, did not suffice to put the issue raised on appeal, i.e., whether MDE review and approval was required to approve the Preliminary Plan, before the Board.[6]

---

[6] At the request of counsel for appellants, after oral argument, the Court allowed counsel to submit a short supplemental written argument. In that argument, counsel for appellants pointed to arguments made in the circuit court and this Court in support of appellants' assertion that the issue was preserved for review. It is the argument before the Board, however, that is relevant. *See Cap. Com. Properties, Inc. v. Montgomery Cnty. Plan. Bd.*, 158 Md. App. 88, 96 (2004) ("Under settled Maryland law, appellate review of administrative decisions is limited to those issues and concerns raised before the administrative agency."). Those filings do not help with the preservation issue. Counsel also argued that the issue regarding MDE approval was encompassed in the Board's decision. A review of the Board's decision refutes that assertion, as appellants noted in their reply brief, which stated that the Board "never mentioned the potential role of MDE in reviewing and approving the set-aside calculation, let alone offer an excuse for not dealing with the issue in its Resolution."

In *Center for Sustainable Economy v. Jewell*, 779 F.3d 588, 602 (D.C. Cir. 2015), the court explained:

> The question in determining whether an issue was preserved, however, is not simply whether it was raised in some fashion, but whether it was raised with sufficient precision, clarity, and emphasis to give the agency a fair opportunity to address it.

> \*　　　\*　　　\*

> Whether an objection is fairly raised depends on, among other things, the size of the record, the technical complexity of the subject, and the clarity of the objection. *See, e.g., Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1111 (D.C. Cir. 1998). As we have previously explained, "[t]he fact that, buried in hundreds of pages of technical comments . . . some mention is made [of an argument related to a claim brought on judicial review] . . . is insufficient to preserve the issue for review on appeal." *Id.*

We agree with the federal court that a passing reference to an issue, without making clear the substance of the claim, is insufficient to preserve an issue for appeal, particularly in a case with a voluminous record.

Here, appellants' brief reference to MDE in a written document in a lengthy record did not fairly raise the issue presented on appeal. It did not fairly put the Board on notice of the claim that the Preliminary Plan should not have been approved because the set-aside calculation had not been reviewed and approved by MDE, and it did not give the Board the opportunity to address this issue. The issue, therefore, is not preserved for this Court's review.[7]

---

[7] Even if the issue was preserved for review, we would conclude that appellants' contention lacks merit. COMAR 26.04.02.05.Q(3) provides that, if "[a]n *application for a large on-site sewage disposal system* is submitted by the property owner," the Approving Authority and MDE perform a joint "[e]valuation and review" of the application.

## II.

## Accuracy of the Forest Set-Aside Calculation

Appellants next contend that the Board "misapplied the established methodology for computing the septic field acreage required for wastewater flows exceeding 500 GPD." They argue, as they did below, that the forest set-aside calculation did not incorporate "a 1.5 multiplier for each unit of 500 gallons after the first unit" of 10,000 square feet of absorption area, and because the multiplier was not factored into the set-aside calculation, the calculation "understated the school-use set-aside calculation by . . . 2.3 acres."

Appellants' argument is based primarily on COMCOR 27A.00.01.05.K,[8] which provides:

> Where facilities other than single family dwellings or shared facilities are contemplated, and the total absorption field exceeds 10,000 square feet, each additional 10,000 square feet or portion must be established on separate 15,000–40,000 square feet of available useable land or proportional area depending on percolation rates in accordance with the table below. . . . This density criterian [sic] also applies to easement areas.

---

(Emphasis added). Jesus House did not apply for an on-site sewage system. Rather, the Preliminary Plan proposed that, in exchange for a covenanted set-aside of forest area, the Property would be connected to the county sewer system pursuant Resolution 14-334. COMCOR 27A.00.01.07.G provides that "[*a*]*ll systems treating 5,000 gallon daily flows or more* require review and approval by" MDE. (Emphasis added). As indicated, *no* on-site sewage system was proposed in the Preliminary Plan. Therefore, under the facts of the present case, MDE review and approval were not required before the Board could approve the Preliminary Plan.

[8] Appellants also cite to COMCOR 27A.00.01.08.A.2.a and COMCOR 27A.00.01.08.A.2.b. See footnote 1, *supra*, for the text of these regulations.

Appellants state that everyone agrees that a "350-student school with a total GPD water flow of 30 per student" equals a "a total of 10,500 GPD," or "21 units of 500 gallons." They explain their different approaches from that point as follows:

> Raztec multiplies 21 times 10,000 square feet per unit to produce 210,000 square feet, or 4.82 acres. . . . Gannett Fleming instead multiplies the first of the 21 units times 10,000 square feet and then multiplies the remaining 20 units times 15,000 square feet. . . . The result is 10,000 + (20 x 15,000) = 10,000 + 300,000 = 310,000 square feet, or 7.12 acres.

More concisely, they assert that "Gannett Fleming used a 1.5 multiplier for each unit of 500 gallons after the first unit, whereas Raztec used no multiplier at all."[9]

Appellees contend that "the Board's finding regarding the sufficiency of the septic set-aside calculations to meet the condition of the category change was legally correct and based on substantial evidence." They make several assertions in that regard. First, they note that COMCOR 27A.00.01.05.K is not applicable in cases where advanced pretreatment of the sewage is required, and if an application was received for a place of worship of the proposed facility, such pretreatment would be required. Second, they point to the testimony of Ms. Benham from MCDPS, "the agency [which] regularly administers the relevant septic regulations," that the additional 15,000 to 40,000 square feet required under COMCOR 27A.00.01.05.K referred to the size of the overall lot, not the amount of septic area. They assert that the Board was entitled to rely on MCDPS' interpretation of the regulation, which it "does regularly administer." Finally, they argue that, even if

---

[9] In their supplemental argument, appellants also note that there was evidence that the company evaluating the septic field that the Adventist Church would have needed in 1999 also used a multiplier in its calculation.

appellants' interpretation of COMCOR 27A.00.01.05.K was correct, the Board "explicitly found that such provision would not apply to the Preliminary Plan, essentially mooting [their] argument." They assert that, although appellants argue that "the definition of subdivision contained in the Subdivision Regulations should apply rather than the definition contained in COMCOR 27A.00.01.01," "[t]here is simply no basis for ignoring the definition contained in the actual regulations in favor of applying" a different definition "from a wholly disparate part of the County Code."

Whether the forest set-aside calculation was correct turns, in part, on the interpretation of COMCOR 27A.00.01.05.K. It is well established that "the interpretation of a regulation is akin to the interpretation of a statute. It is an issue of law which, ultimately, the court must decide." *Md. Bd. of Pub. Works v. K. Hovnanian's Four Seasons at Kent Island, LLC*, 425 Md. 482, 520 (2012). "We review questions of statutory or regulatory interpretation de novo." *Sail Zambezi, Ltd. v. Md. State Highway Admin.*, 217 Md. App. 138, 150 (2014).

"When we construe an agency's rule or regulation, 'the principles governing our interpretation of a statute apply.'" *Hranicka v. Chesapeake Surgical, Ltd.*, 443 Md. 289, 298 (2015) (quoting *Christopher v. Montgomery Cnty. Dep't of Health and Human Servs.*, 381 Md. 188, 209 (2004)). "In construing a statute, one begins with the 'plain meaning' of the statutory language and may end there if the meaning is plain enough." *State v. Roshchin*, 446 Md. 128, 140 (2016). "We 'will give effect to the statute as it is written' so long as 'the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning.'" *Moore v. RealPage*

29

*Util. Mgmt., Inc.*, 476 Md. 501, 511 (2021) (quoting *United Bank v. Buckingham*, 472 Md. 407, 423 (2021)).

When the language of the regulation is not clear and unambiguous, however, "we look to the agency's interpretation of its own regulation." *Bd. of Liquor License Comm'rs for Balt. City v. Kougl*, 451 Md. 507, 517 (2017). "It is well-settled that an administrative agency is entitled to deference in the interpretation of its own propounded regulations unless the agency's interpretation is clearly erroneous or inconsistent with the regulation." *Para v. 1691 Ltd. P'ship*, 211 Md. App. 335, 389 (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)), *cert. denied*, 434 Md. 314 (2013). *Accord Ideal Fed. Sav. Bank v. Murphy*, 339 Md. 446, 461 (1995) ("[A]n agency's interpretation of an administrative regulation is 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945))). Appellate courts "do not play the role of an über administrative agency in reviewing the actions of state or local administrative bodies, but, rather we exercise discipline in our review so as not to cross the separation of powers boundary." *Kor-Ko Ltd. v. Md. Dep't of the Env't*, 451 Md. 401, 413 (2017). "[T]he expertise of the agency in its own field should be respected." *Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 174 (2011).

Here, there is some ambiguity in COMCOR 27A.00.01.05.K. As indicated, that regulation provides that, when "the total absorption field exceeds 10,000 square feet," then "each additional 10,000 square feet or portion must be established on separate 15,000– 40,000 square feet of available useable land" depending on tabulated percolation rates. COMCOR 27A.00.01.05.K. The parties disagreed regarding whether the extra 15,000 to

30

40,000 square feet of usable land related to the septic area or the total area of land on the Property. The language of the regulation does not make this distinction clear and unambiguous.

Ms. Benham, the manager of MCDPS's Well and Septic Section, testified regarding the meaning of COMCOR 27A.00.01.05.K as follows:

> The problem is that the calculation from Gannett Fleming increased the acreage of the septic area by adding a multiplication factor for the land required. And I don't know, you know, this term multiplication factor, I'm not sure where it came from; it's not referenced in the [COMCOR]; however, the additional square feet listed in the table, which is the 15 to 40,000 square feet, is for determining the overall size of the lot itself, not the amount of septic area.
>
> The intent behind this regulation was to ensure that nitrate levels stayed below the allowable amount for lots that were created with septic areas over 10,000 square feet. So, as the effluent moved underground and across the property, the nitrate would dilute to at or below the limits set before the nitrogen plume left the property boundary.
>
> So, the density requirement is actually outdated and has not really been needed since reduction in nitrogen can now be achieved by using pretreatment; also, sometimes known as best available technology.

Although Mr. Livay testified that the extra 15,000 to 40,000 square feet of land area referred to in the regulation was applicable to the calculation of the set-aside for the septic area, the Board rejected this testimony in favor of that of Ms. Benham. It stated:

> [Appellants] have misinterpreted the requirements of [COMCOR 27A.00.01.05.K] by concluding, and adding into their calculations, that the septic set aside must be increased for density requirements. The Planning Board finds that while the requirements of [COMCOR 27A.00.01.05.K] require the septic area to be established on an additional 15,000 to 40,000 square feet of land when the septic area exceeds 10,000 square feet, it does not mean that this additional area must also be added to the septic area. This regulation is used to ensure that nitrogen levels stay below the allowable amount by determining the necessary size of the overall lot, not the size of a

31

septic area. Thus, the misinterpretation by [appellants] has resulted in an additional multiplication factor added to their septic set aside calculation that does not exist in Montgomery County Code.

Giving the Board and MCDPS deference in the interpretation of this regulation, *see GenOn Mid-Atl., LLC v. Md. Dep't of the Env't*, 248 Md. App. 253, 271 (2020) (When the construction of an administrative regulation that the agency administers is at issue, "'deference is even more clearly in order.'" (quoting *Kor-Ko*, 451 Md. at 412)), we conclude that the Board's determination that the Preliminary Plan satisfied the requirement of Resolution 14-334 was legally correct, and it was supported by substantial evidence.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**